# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| DAVID A. C., JR.,[1] | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, COMMISSIONER | : | |
| OF SOCIAL SECURITY,[2] | : | No. 22-2055 |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

**PAMELA A. CARLOS**
**U.S. MAGISTRATE JUDGE**                                                                 **July 15, 2024**

Plaintiff David A. C., Jr. appeals the Commissioner of Social Security's final decision to deny his claim for benefits. Plaintiff explains that although the Administrative Law Judge ("ALJ") found that he suffers from several severe mental impairments, including schizophrenia, bipolar disorder, depressive disorder, and adjustment disorder, the ALJ nevertheless found that Plaintiff could perform numerous jobs in the economy. Plaintiff contends that this decision was erroneous for several reasons, arguing most convincingly that the ALJ's reliance on Plaintiff's non-compliance with prescribed medications was misplaced. The Commissioner disagrees, arguing that "the overwhelming evidence of record reflects that while compliant with his medication," Plaintiff's mental status examinations were relatively benign and that the ALJ "quite reasonably"

---

[1] In accordance with the Court's recent standing order on party identification in social security cases, I have referred to the plaintiff solely by his first name and last initial. *See* Standing Order, *In re: Party Identification in Social Security Cases* (E.D. Pa. June 10, 2024), https://www.paed.uscourts.gov/sites/paed/files/documents/locrules/standord/SO_pty-id-ss.pdf.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

concluded that with the limitations caused by Plaintiff's impairments, he was still capable of working. *See* Doc. No. 13 at 1.

But there is no merit to the Commissioner's arguments or his characterization of the evidence. A close review of the Decision confirms that several of the ALJ's findings and conclusions were expressly predicated on Plaintiff's alleged non-compliance with his medications. The ALJ repeatedly cited to Plaintiff's "compliance" and/or "non-compliance" to explain away extensive evidence of Plaintiff's aggressive behavior and his lengthy history with involuntary hospitalizations. But at no point did the ALJ consider, let alone address, whether the observed non-compliance was itself due to or related to his underlying illness. Federal courts in this district, and across the country, consistently recognize that a claimant's failure to comply with treatment can, and often is, the direct result of their diagnosed bipolar disorder or schizophrenia. Given this, courts have admonished ALJs who draw adverse inferences against claimants under these circumstances without first addressing whether the observed non-compliance was itself due to mental illness. That is precisely what happened here.

As explained more fully below, I will grant Plaintiff's request for review and remand this matter to the Commissioner for further proceedings in accordance with this opinion.

I.     **BACKGROUND**

    A.     **Factual and Procedural History.**

Plaintiff was born in February 1987 and was therefore 34 years old as of the ALJ's decision. R.203. He has limited education, testifying that he stopped attending school after the eleventh grade, and has a history of work as a stock clerk and a companion. R.26.

On March 27, 2020, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging he became unable to work due to disabling

conditions on January 3, 2018. R.108-109, 203-215. Specifically, he alleged that he is unable to work due to depression, bipolar, and related disorders. R.108-109. His applications were initially denied on September 18, 2020, *see* R.110-118, and again upon reconsideration on December 1, 2020. *See* R.126-132. Plaintiff then requested a hearing before an ALJ, *see* R.133, and a hearing was held on April 6, 2021, *see* R.34-64 ("hearing transcript"). The ALJ issued a written decision on July 23, 2021 denying Plaintiff's claim. R.13-28 ("ALJ Decision"). The Appeals Council denied Plaintiff's subsequent request for review, meaning the ALJ's written opinion became the final decision of the Commissioner. *See* R.1-7. Plaintiff now timely appeals.[3]

**B.     ALJ's Decision.**

The ALJ evaluated Plaintiff's claims using the five-step sequential analysis set forth in the Social Security regulations.[4] Beginning at step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since January 3, 2018. R.18. The ALJ specifically noted that "[t]here are no earnings since 2017 and nothing on a new hire report." R.18 (citations omitted).

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: schizophrenia spectrum and other psychotic disorders, depressive disorder, adjustment disorder, and substance use disorder. R.19 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)) The ALJ further

---

[3]     The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C § 636(c). *See* ECF Doc. No. 6.

[4]     The sequential analysis requires the ALJ to evaluate (1) whether claimant's work, if any, qualifies as "substantial gainful activity"; (2) whether the claimant's medically determinable impairments are severe; (3) whether any of the claimant's impairments "meet or equal the requirements for impairments listed in the regulations"; (4) whether the claimant is able to perform "past relevant work" considering his residual functional capacity; and (5) whether the claimant can adjust to other work considering his residual functional capacity, age, education, and work experience. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201-202 (3d Cir. 2019) (citing 20 C.F.R. § 416.920(a)(4)(i)-(v)). The claimant has the burden of proof at steps one through four, and then at step five, the burden shifts to the Commissioner of Social Security. *Id.* at 201.

explained that the "record refers to hypertension and obesity," but that "[t]hese impairments cause no more than minimal limitation to the claimant's ability to perform basic work tasks and are therefore nonsevere." R.19

Moving on to step three, the ALJ concluded that none of Plaintiff's severe impairments alone, or in combination, met or medically equaled the requirements of the impairments listed in the regulations. R.19-21. Specifically, the ALJ compared Plaintiff's impairments to the listings in Sections 12.03 ("Schizophrenia spectrum and other psychotic disorders") and 12.04 ("Depressive, bipolar and related disorders"). R.19-21. In doing so, the ALJ found that Plaintiff had either mild or moderate limitations in all four of the paragraph B criteria of the listings, which include the ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. R.19-20.

When assessing Plaintiff's ability to interact with others, the ALJ found that Plaintiff had only a moderate limitation. R.20. The ALJ acknowledged that Plaintiff "has a history of aggression, with multiple involuntary hospitalizations due to aggressive behavior," and "a history of arrests and convictions," including one as recently as 2016 for violating a restraining order. R.20 (citing Exs. B1F, B2F, B3F,[5] B4F, and B9F). Nevertheless, the ALJ explained that Plaintiff's "aggression improved with regular treatment and compliance with medication." R.20 (citing Exs. B10F, B11F, and B12F).

---

[5] Exhibit B3F corresponds to pages 366 to 368 in the administrative record. However, the name and medical record number on these pages indicates that these are *not* Plaintiff's records. Nevertheless, the ALJ appears to have cited to this Exhibit several times throughout her Decision, and those citations are included in this summary here. More troubling still, Plaintiff expressly noted this discrepancy in his opening brief in support of review and explained that these materials should have been stricken from the record. *See* Doc. No. 10 at 11, n 5. Despite this notice, the Commissioner's response brief explained that the "ALJ correctly observed that these hospitalizations coincided with medication non-compliance," before reciting specific passages from Exhibit B3F. *See* Doc. No. 13 at 10-11.

With regard to Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ also found that Plaintiff had only a moderate limitation. R.20. The ALJ acknowledged that Plaintiff "has a history of psychosis," but again noted that this occurred "primarily in the context of medication noncompliance." R.20 (citing Exs. B1F, B2F, and B3F).

Finally, as for the ability to adapt or manage oneself, the ALJ found that Plaintiff had only a moderate limitation. R.20. The ALJ explained, "[a]s previously noted, the claimant has a history of multiple psychiatric hospitalizations for issues such as medical noncompliance, aggression, and psychosis." R.20 (citing Exs. B1F, B2F, B3F, B9F) (cleaned up). These mental status examinations showed instances of "disheveled appearance and fair hygiene." R.20 (citing Exs. B2F and B12F). But according to the ALJ, his more recent records "indicate neat grooming, appropriate behavior, full orientation, and average judgment." R.20 (citing Ex. B12F).[6]

Before reaching step four, the ALJ considered Plaintiff's residual functional capacity ("RFC")[7], ultimately determining that Plaintiff:

> [H]as the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to performing simple, routine tasks and making simple, work-related decisions. The claimant can have no contact with the public and no more than occasional contact with supervisors and coworkers. The claimant is further limited to work involving only occasional changes in the work setting, but not involving teamwork.

R.21. After briefly summarizing Plaintiff's testimony, and the testimony of his mother, the ALJ explained that Plaintiff's "medically determinable impairments could reasonably be expected to

---

[6] The ALJ also found that the evidence failed to establish the presence of paragraph C criteria from the listings. R.20-21. In doing so, the ALJ again repeated his observations concerning Plaintiff's medication noncompliance. R.21 ("Here, while the claimant has a history of inpatient hospitalizations, these stays have occurred largely in the context of medication noncompliance.") (citations omitted).

[7] Residual functional capacity, or RFC, is defined as "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

5

cause the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R.22.

Again, the ALJ acknowledged Plaintiff's extensive history of arrests and/or inpatient psychiatric hospitalizations. For example, the ALJ noted that Plaintiff had been hospitalized three times from 2014 through 2017—prior to the alleged onset date—and then again in January/February 2019, when he was hospitalized for five days on an involuntary commitment petition ("302") filed by his mother "due to the [Plaintiff's] aggressive behavior and medication noncompliance." R.22 (citing Exs. B1F, B2F).  Plaintiff was then hospitalized in February/March 2019 for over two weeks after his mother filed a second 302 petition. R.22. The ALJ noted that his mother reported that Plaintiff was "noncompliant with his medication, and was playing with lighters and punched a hole in the wall after his parents took the lighter away." R.22.

A few months later, in July 2019, Plaintiff began an outpatient program following a domestic violence offense involving his ex-partner. R.23. By early 2020, Plaintiff's mother filed another 302 petition resulting in Plaintiff's hospitalization for two weeks. R.23. The ALJ observed that Plaintiff was "noncompliant with his medication on at least two occasions," during his stay, and was ultimately diagnosed with schizophrenia and marijuana use disorder. R.23. In March 2020, Plaintiff "was again hospitalized for about two weeks . . . secondary to a 302 petition filed by his mother for medication noncompliance, talking to himself, hearing voices, dangerous and threatening behavior, and poor sleep." R.23. His discharge diagnoses were "unspecified bipolar 1 disorder and unspecified psychosis." R.23 (citing Ex. B9F).

However, the ALJ explained that after his August 2019 psychological evaluation, "the claimant treated at the Joseph J. Peters Institute until his discharge in August 2020 when he was

6

noted to have had 'successful completion' of the program." R.23. According to the ALJ, Plaintiff attended weekly therapy, there was no evidence of psychosis or psychiatric distress, and that he "repeatedly told providers that his mood had stabilized with compliance with psychiatric medication." R.23-24. The ALJ also noted that Plaintiff reported "being 'very involved in a business (along with his best friend Byron) which consists of researching, purchasing, cleaning, and then re-selling cars.'" R.24 (citing Exs. B5F, B10F, and B11F).[8] According to the ALJ, at the time of his discharge, "providers noted that the [Plaintiff] 'took ownership of his offensive behavior and gained an understanding of the factors that led to it.'" R.24 (citing Exs. B5F, B10F, and B11F).

Given the above, the ALJ explained that the majority of Plaintiff's "lengthy history of inpatient treatment," occurred "in the context of noncompliance of medication." R.24. Indeed, the ALJ explained that Plaintiff "described being largely independent with activities of daily living, and reported other activities such as going to the gym and running a car business . . . with his friend." R.24 (citing Es. B4F, B10F).

---

[8] While not immediately relevant to the disposition of this matter, the undersigned notes that the ALJ's reliance on Plaintiff's alleged car selling business is troubling. As Plaintiff noted in his brief in support of review, the ALJ twice highlighted Plaintiff's statement concerning a purported car business and used this as evidence that he was more functional than alleged. *See* Doc. No. 10 at 10, n. 4 (citations omitted). However, the ALJ "never recognized that [Plaintiff] had made similar statements [concerning a car business] during a period of acute psychosis and paranoid thought in 2014." *See id.* (citing R.357). Additionally, "[t]here is no evidence that [Plaintiff] produced any income from such activity, and the ALJ found that he had no earnings since 2018." *See id.* (citing R.18). Yet, in response, the Commissioner ignored this observation and emphasized that Plaintiff "described largely independent activities of daily living (including running a car business)." *See* Doc. No. 13 at 17 (citing R.24). But the ALJ did not ask Plaintiff *any* questions about this business during the hearing, and had already found that Plaintiff was not engaged in substantial gainful activity since January 3, 2018. R.18. Given this context, it is not at all clear how Plaintiff's statements undercut his disability claim.

At step four, the ALJ found that given Plaintiff's RFC, he could not perform any past relevant work. R.26. The ALJ then proceeded to step five and identified multiple jobs in the national economy that Plaintiff could perform, including brimer, optical implant polisher, and decal applier. As such, the ALJ concluded that Plaintiff was not disabled as that term is defined by the Social Security Act ("SSA"). R.27

## II.   STANDARD OF REVIEW

Judicial review of a social security disability determination is "limited." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The agency's factual findings are "conclusive," and therefore must be upheld, if they are supported by "substantial evidence." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). Substantial evidence is not a demanding standard. *Id.* at 1154. All it means is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1153 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Rutherford*, 399 F.3d at 552 (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). In applying this deferential standard of review, the Court "must not substitute [its] own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford*, 399 F.3d at 552). In other words, the Court must not re-weigh the evidence before the ALJ, but instead must assess whether substantial evidence supports the ALJ's findings. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations.").

In doing so, the Court determines whether the ALJ's decision "meets the burden of articulation demanded by the courts to enable informed judicial review." *Kenyon v. Saul*, No. 1:20-

CV-1372, 2021 WL 2015067, at *5 (M.D. Pa. May 19, 2021). In this regard, the ALJ need not "employ particular 'magic' words" or "adhere to a particular format in conducting his analysis." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Jones v. Barnhart,* 364 F.3d 501, 505 (3d Cir. 2004)). The Court requires—at the very least—that the ALJ "set forth the reasons for [their] decision." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

## III.  DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on three grounds. First, he contends that the ALJ rejected the opinion of examining psychologist, Christopher Patrone, Psy.D, for erroneous reasons, in violation of the regulations and the law of this circuit. *See* Doc. No. 10 at 4-14. Next, Plaintiff argues that the ALJ erred when finding his impairments do not meet the requirements of the listing of impairments. *See id.* at 14-16. And finally, Plaintiff contends the ALJ erroneously found Plaintiff's testimony was not consistent with the evidence, and entirely failed to make any findings regarding his parents' testimony. *See id.* at 16-20.

The common thread underlying these challenges—and the Decision as a whole—is the ALJ's observations concerning Plaintiff's noncompliance with treatment. "As noted in SSR 16-3p, 2016 WL 1119029, the decreased insight and judgment accompanying severe mental impairments may be a reason that medication or treatment protocols are not strictly followed." *Cordero v. Kijakazi*, 597 F. Supp. 3d 776, 789 (E.D. Pa. 2022). As SSR 16-3p explains:

> We [the Administration] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

*See* SSR 16-3p, 2016 WL 1119029. Such reasons include, but are not limited to, a claimant's mental impairment that affects his or her judgment or orientation. *Id.* Indeed, "[f]ederal courts have

9

repeatedly noted that the mental impairment itself may cause the noncompliance, as 'people with serious psychiatric problems are often incapable of taking their prescribed medications consistently.'" *Cordero*, 597 F. Supp. 3d at 790 (quoting *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011)); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 610 (1999) (Kennedy, J., concurring) ("It is a common phenomenon that a patient functions well with medication, yet, because of the mental illness itself, lacks the discipline or capacity to follow the regime the medication requires.").[9] In this regard, courts have regularly held that ALJs must take into account whether a mentally ill claimant's failure to comply with prescribed treatment results from the illness itself. *See, e.g.*, *Frankhauser v. Barnhart*, 403 F. Supp. 2d 261, 277-78 (W.D.N.Y. 2005); *Brashears v. Apfel*, 73 F. Supp. 2d 648, 652 (W.D. La. 1999) (remanding case to receive new evidence regarding the reason for plaintiff's non-compliance with her prescribed medication for schizophrenia).[10]

Yet, that did not occur here. Between January 2019 and March 2020, the ALJ confirmed that Plaintiff had been hospitalized on numerous occasions, each one resulting from an involuntary

---

[9] *See also Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."); *Mendez v. Chater*, 943 F. Supp. 503, 508 (E.D. Pa. 1996) (observing that plaintiff had been found to suffer from a mental illness, and "[a]lthough she has discontinued prescribed medications, any noncompliance on her part could have been a result of her mental impairment and, therefore, neither willful nor without a justifiable excuse.").

[10] *See also Jimmeson v. Berryhill*, 243 F. Supp. 3d 384, 391 (W.D.N.Y. 2017) (holding that the ALJ's vague references to plaintiff's impulse control and bipolar problems was not harmless error, and the "ALJ did not meaningfully incorporate their medical manifestations into her RFC."); *Voorhees v. Colvin*, 215 F. Supp. 3d 358, 381 (M.D. Pa. 2015) ("It is error to draw adverse inferences from a claimant's failure to comply with treatment without addressing whether the non-compliance was due to her mental illness.").

commitment petition filed by his mother (i.e., a "302 petition") R.22-23.[11] On several occasions, his hospitalization lasted over two weeks, and no visit was shorter than five days. *Id.*

Following his first hospitalization in January/February 2019, the discharge summary noted that Plaintiff "has a history of aggressive behavior in the past and [he] has had to be tasered by police in prior 302 situations." R.361. During his stay, he was started on Zyprexa but "[h]e did not agree that he needed medication." R.362.

For his second hospitalization in February/March 2019, the discharge summary again noted aggressive behavior and stated that Plaintiff was "mumbling to himself and appear[ed] to be responding to internal stimuli." R.359. During his stay, he was provided with additional medications, but "[s]aid he felt that he was here against his will, yelling, actively responding to internal stimuli, and focused on discharge." R.360. After finally accepting a long-acting injection, he stated that he was "committed to medications as an outpatient and said he would continue reporting for his long-acting injection." R.360.[12]

During his next hospitalization in January/February 2020, Plaintiff was again treated with several different medications, including Abilify for psychosis. R.518. The notes explained that although he was generally compliant with his medications as prescribed, he refused to take Abilify on at least two occasions, and declined to attend most of the psychotherapy groups. R518.

---

[11] The ALJ also noted that Plaintiff had been hospitalized at least three times from 2014 through 2017. R.22.

[12] In her Decision, the ALJ also explained that "[i]n March/April 2019, the claimant was hospitalized for about a week at Friends Hospital secondary to a 302 petition filed by his mother for assaultive behavior in the context of psychosis." R.23 (citing Exhibit B3F). But as noted above in footnote 5, Exhibit B3F do not appear to be Plaintiff's records.

And finally, during his hospitalization in March 2020, the discharge summary noted again that medications stabilized his condition, and a social worker contacted his family to set up an outpatient program. R.429.

The pattern above is illuminating. On at least four separate occasions, Plaintiff discontinued his medications, his condition deteriorated, and he was hospitalized against his will. Only with intensive inpatient treatment—sometimes lasting weeks—and several different medications did Plaintiff stabilize. Upon discharge, Plaintiff sometimes reported an interest in continuing treatment, and sometimes he did not.

Despite this pattern, one that is quite common for patients suffering from bipolar disorder and schizophrenia,[13] the ALJ explained that Plaintiff completed an outpatient program with the Joseph J. Peters Institute, and providers noted that Plaintiff "took ownership of his offensive behavior and gained an understanding of the factors that led to it." R.24 (citing Exs. B10F, B11F). The ALJ further observed that providers stated that he "presented in a cooperative and respectful manner and there were no additional incidents of aggressive behavior since he started treatment." R.24. Given this, the Commissioner argued that under Third Circuit caselaw, an ALJ may reasonably conclude, as they did here, that a condition controlled by medication or treatment is not disabling. *See* Doc. No. 13 at 11-12 (citing *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 146 (3d Cir. 2007); *Dearth v. Barnhart*, 34 F. App'x 874, 875 (3d Cir. 2002)).

---

[13] The National Institutes of Mental Health has observed that, "[n]oncompliance with medication is a very common feature among bipolar patients," and "[r]ates of poor compliance may reach 64% for bipolar disorders, and noncompliance is the most frequent cause of recurrence." *See Howard v. Astrue*, No. CIV-09-614-L, 2010 WL 1372662, at *6 (W.D. Okla. Mar. 9, 2010), report and recommendation adopted, No. CIV-09-614-L, 2010 WL 1372646 (W.D. Okla. Mar. 31, 2010) (citation omitted).

But the ALJ's analysis is inadequate for several reasons. First, the provider's observation concerning Plaintiffs' lack of aggressive behavior since starting treatment at the Joseph J. Peters Institute is plainly inaccurate. Plaintiff began his treatment in August of 2019 after he had been incarcerated from April to June of that same year for failing to report to probation and because he violated an existing Protection From Abuse ("PFA") order that had been put in place in 2017. R.398-405. Despite beginning this treatment, and as noted immediately above, Plaintiff was hospitalized on two occasions—once in January/February 2020 and again in March 2020.[14] Therapist notes from July 2020 also revealed that after these hospitalizations, Plaintiff "did not respond to outreach phone calls post-discharge," and he "became verbally aggressive with this therapist several weeks ago on the phone and missed a staffing." R.529. While Plaintiff may have acknowledged his actions were inappropriate, it is evident that he continued to struggle with medication compliance even after beginning outpatient treatment, and he continued to exhibit some forms of aggression.

More significantly, the ALJ never considered whether Plaintiff's inability to comply with his treatment plan was itself related to his mental health condition despite significant record evidence suggesting as much. During the hearing, the ALJ asked Plaintiff whether he needed reminders to take his medications, and Plaintiff responded that his mother "makes sure I take my

---

[14] Other notes in the record further undercut any observation that with treatment, Plaintiff's condition was improving. On January 23, 2020—again *after* Plaintiff began with the Joseph J. Peters Institute several months prior—therapist notes revealed that although Plaintiff stated he had been compliant with his medications, he made several comments during the session that were "tangential and did not entirely make sense." R.535. After a visit on February 14, 2020, Plaintiff reported that he stopped taking his medication and drank some beers with his father, thus prompting his parents to call 911 on him again. R.533. And as noted above, Plaintiff was hospitalized during these months.

13

medicine every day, and yea that's how we've been doing it." R.50. The ALJ asked no follow up questions of either Plaintiff or of his mother,[15] and did not address this in the Decision.[16]

In short, the ALJ repeatedly referred or cited to Plaintiff's noncompliance with his medication to discount extensive evidence within the record. This evidence consisted of not only Plaintiff's subjective complaints, but also the testimony of his parents, medical opinion evidence, his arrest history, and recurring hospitalizations, almost all of which were involuntary. Given the importance of this observation it was incumbent upon the ALJ to at least consider whether Plaintiff's mental illness contributed to his noncompliance.[17] But this did not occur, thus warranting remand.

In light of these errors, the undersigned cannot properly assess the remainder of the Decision and makes no findings with respect to Plaintiff's arguments concerning the medical opinion of Christopher Patrone, Psy.D, the listing of impairments, and the ALJ's treatment of the

---

[15] Plaintiff's mother later testified, that although Plaintiff has recently been taking his medicine, "I still see where he talks to hi[m]self when he's alone."  R.56.

[16] In response to Plaintiff's brief in support of judicial review, the Commissioner argued that "Plaintiff understood that he needed to take his medication," and cited select portions of the record where Plaintiff evidently demonstrated insight into his circumstances and acknowledged that medications led to feelings of stability. *See* Doc. No. 13 at 14-15 (citations omitted). There is no merit to this argument. As Plaintiff explained in reply, "the mere fact that Mr. C[] expressed such understanding during periods in which he was not psychotic does not demonstrate that he maintained and acted on such understanding during periods of acute illness." *See* Doc. No. 16 at 6. Moreover, and as recounted at length above, over the span of eighteen months Plaintiff often acknowledged that he should continue with treatment after being stabilized in the hospital. Despite this, the pattern persisted, and Plaintiff discontinued his medications and was hospitalized soon thereafter. It is evident that the Commissioner simply cherry-picked certain portions of the record to support his position while ignoring extensive evidence to the contrary.

[17] *See Pounds v. Astrue*, 772 F. Supp. 2d 713, 723 n.21 (W.D. Pa. 2011) (observing that although symptoms that are reasonably controlled by medication are not disabling, "it is clear from the medical literature available to the general public and has been recognized in legal opinions that non-compliance is a hallmark of bipolar disorder, particularly when the person is in the manic phase," and therefore the ALJ should have "directly addressed" this in his decision).

testimony. Rather, on remand, the ALJ must first explain whether Plaintiff's observed non-compliance with medication is related to or caused by his underlying illnesses in a manner consistent with the regulations. This initial finding will undoubtedly inform how the ALJ assesses the remainder of the evidence and could result in a finding of disability.

## IV. CONCLUSION

For the reasons explained above, Mr. C.'s request for review is **GRANTED**. The Court finds that the ALJ's decision is not supported by substantial evidence in. As such, the final decision of the Commissioner of Social Security is **VACATED,** and this matter is **REMANDED** for further proceedings in accordance with this opinion. An appropriate Order follows.

BY THE COURT:

*s/Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge